JUDGE CROTTY

09 CV 2359

Allen C. Wasserman (AW 4771)
LOCKE LORD BISSELL & LIDDELL LLP
885 Third Avenue, 26th Floor
New York, New York 10022
212-812-8306

Roger B. Cowie
(pro hac vice admission pending)
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201
212-740-8000

Attorneys for Plaintiff

RECEIVED
MAR 13 2009
U.S.D.C. S.D.N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
CHRISTOPHER M. WILLIAMS, in his capacity as
Shareholders' Representative,

      Plaintiff,

  vs.

SILVER POINT CAPITAL FUND, L.P. and SP
SAGE LLC,

      Defendants.
------------------------------------X

Case No.

**COMPLAINT**

Plaintiff Christopher M. Williams ("Williams"), in his capacity as "Shareholders' Representative" under the Agreement and Plan of Merger ("Merger Agreement") among Sage Telecom, Inc. ("Sage"), Silver Point Capital Fund, L.P. ("Silver Point") and Williams, by his attorneys, Locke Lord Bissell & Liddell LLP, alleges for his complaint, upon knowledge and belief as to his own acts and upon information and belief as to the acts of all others, as follows:

## NATURE OF THIS ACTION

1.  This action arises from improper claims made by defendants Silver Point and SP Sage LLC ("SP Sage") (collectively, "Defendants") to a $4.8 million escrow fund (the "Escrow

Fund"), the proceeds of which are payable to Williams, in his capacity as "Shareholders' Representative," as defined in the Merger Agreement. As alleged herein, Defendants have breached their agreements with Williams and violated their duty of good faith and fair dealing by making improper, unsupportable and exaggerated claims to the Escrow Fund in order to prevent the proceeds from being distributed to their rightful owners.

## THE PARTIES

2. Plaintiff Williams is an individual who resides in Plano, Texas. He is the "Shareholders' Representative" under the Merger Agreement, with the express power to act in the name, place, and stead of Sage's former shareholders, whose ownership interests in Sage were acquired by Defendants pursuant to the Merger Agreement. In this Complaint, the term "Shareholders' Representative" is used to refer to Williams, in his capacity as the Shareholders' Representative under the Merger Agreement.

3. Defendant Silver Point is a Delaware limited partnership with its principal place of business in Connecticut. It is the "Buyer" of Sage under the Merger Agreement. Silver Point regularly conducts business in New York and, pursuant to the Merger Agreement, has expressly consented to litigate in New York any claims arising under, or related to, the Merger Agreement.

4. Defendant SP Sage is a Delaware limited liability company with its principal place of business in Connecticut. It is an affiliate of Silver Point and an assignee of Silver Point's rights and obligations as the Buyer under the Merger Agreement. SP Sage regularly conducts business in New York and, pursuant to the Merger Agreement, has expressly consented to litigate in New York any claims arising under or related to the Merger Agreement.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that there is diversity of citizenship between Shareholders' Representative and Defendants and the amount in controversy exceeds $75,000 exclusive of interest and costs.

6.     This Court has personal jurisdiction over the parties, and venue is appropriate in this district, because Defendants regularly conduct business in this district, the parties have agreed to litigate disputes arising under or related to the Merger Agreement in this district, and the Escrow Fund that is the subject of this action is located and administered in this district.

## FACTUAL BACKGROUND

### The Merger Agreement

7.     On or about December 31, 2006, Shareholders' Representative and Silver Point entered into the Merger Agreement.

8.     Under the terms of the Merger Agreement, Silver Point agreed to pay Sage's shareholders approximately $48 million to acquire all their then-outstanding shares of Sage, with approximately 10% of the purchase price to be deposited in the Escrow Fund.

9.     On or about May 30, 2007, the acquisition described in the Merger Agreement closed, and $4.8 million of the purchase price was deposited in the Escrow Fund.

### The Escrow Agreement

10.    In connection with the closing of the acquisition, Silver Point assigned its rights and obligations under the Merger Agreement to SP Sage. SP Sage and Shareholders' Representative, in turn, executed an Escrow Agreement dated as of May 30, 2007 (the "Escrow Agreement") whereby The Bank of New York was designated as the escrow agent ("Escrow Agent") for the Escrow Fund.

11. Under the terms of the Merger Agreement and the Escrow Agreement, the Escrow Fund was to be distributed to Shareholders' Representative on April 15, 2008 except to the extent needed to satisfy certain indemnity claims asserted by the "Buyer Indemnitees" (as defined in the Merger Agreement) no later than April 15, 2008.

12. If a dispute arose between the Shareholders' Representative and the Buyer Indemnitees about an indemnity claim, the Escrow Agent was not authorized to distribute the amount of the disputed claim from the Escrow Fund until the dispute was resolved. The Merger Agreement, in turn, expressly requires the disputing parties to proceed in "good faith" to resolve any such disputes. Absent resolution of the dispute, the parties agreed in the Merger Agreement to submit to the jurisdiction of this Court to resolve such disputes.

**<u>Defendants' Claim Notices</u>**

13. On April 14, 2008, two days before the Escrow Account was to be distributed to Shareholders' Representative, Defendants submitted an indemnity claim notice ("Claim Notice") to Shareholders' Representative and the Escrow Agent in order to prevent the Escrow Agent from distributing any portion of the Escrow Fund to Shareholders' Representative. In the Claim Notice, Defendants claimed that they were entitled to indemnity from Sage's former shareholders and the Escrow Fund for the following:

   a. Sage's alleged failure to pay certain state sales and use taxes, which Defendants arbitrarily labeled in the Claim Notice as a $1.9 million claim;

   b. Sage's alleged failure to implement a rate increase implied by certain projections, which Defendants arbitrarily labeled in the Claim Notice as a $2.5 million claim; and

   c. Sage's alleged failure to provide certain information about a then-pending lawsuit against Sage (the "*Lanvera* Suit"), which Defendants arbitrarily labeled in the Claim Notice as a $2.2 million claim.

4

14. Additionally, on April 28, 2008, approximately two weeks after the April 15th deadline for submitting claims against the Escrow Fund, Defendants submitted another claim notice (the "FCC Claim Notice") for an unquantified amount because Sage had allegedly received an inquiry from the Federal Communications Commission ("FCC") in connection with an industry-wide investigation being conducted by the FCC. Implicitly recognizing that this purported claim arose too late to possibly be a valid claim against the Escrow Fund, Defendants falsely labeled the FCC Claim Notice as a "supplement" to their original Claim Notice.

15. Pursuant to the Merger Agreement and Escrow Agreement, Shareholders' Representative promptly provided notices to Defendants and the Escrow Agent that Shareholders' Representative disputed Defendants' indemnity claims. Because Defendants' total estimated value of their indemnity claims exceeded the amount in the Escrow Fund, the effect of Defendants' claim notices was to prevent the Escrow Agent from making any distributions from the Escrow Fund to Shareholders' Representative until those claims were resolved by an agreement between Shareholders' Representative and Defendants or by order of this Court.

**Defendants' Bad Faith Tactics and Claims**

16. Promptly after receiving Defendants' claim notices, Shareholders' Representative contacted Defendants' representative to investigate and attempt to resolve Defendants' purported claims. Rather than proceed in good faith to resolve their purported claims, however, Defendants have engaged in a pattern and practice of delaying the resolution of their claims in order to effectively hold the Escrow Fund hostage and gain leverage to obtain a large payment from the Escrow Fund to which Defendants are not entitled. Defendants' bad faith tactics have included, among other things:

    a.    not providing Shareholders' Representative information and documentation regarding those claims in a timely manner;

b.  refusing to withdraw or reduce any of the claims notwithstanding clear evidence that the claims are improper, unsupportable, and inflated; and

c.  refusing to allow any officers or decision makers for Defendants to participate in any negotiations over the claims.

17. The unreasonableness and bad faith of Defendants' claims are illustrated by their claim related to the *Lanvera* Suit. That lawsuit was expressly disclosed to Silver Point in a schedule to the Merger Agreement and all the pleadings and discovery in the lawsuit were disclosed to Silver Point prior to the execution of the Merger Agreement. Following the closing of the merger transaction, Sage won a take-nothing judgment against the plaintiff in that lawsuit and thereafter Sage received a release of claims from the plaintiff as part of a settlement under which Sage did not have to pay anything. Yet, Defendants are continuing to assert a $2.2 million claim against the Escrow Fund related to the *Lanvera* Suit.

18. Defendants' claim regarding Sage's alleged failure to implement a rate increase is equally frivolous and in bad faith. This claim is not based on any representations or promises of a rate increase in the Merger Agreement or related transaction documents as required to constitute a valid claim against the Escrow Fund. Rather, it is based on Defendants' interpretation of an internal Sage financial projection allegedly included in the data room of documents made available to Silver Point prior to execution of the Merger Agreement. Moreover, there were several different internal projections disclosed to Silver Point prior to the execution of the Merger Agreement, and Shareholders' Representative unequivocally cautioned Silver Point that such projections were uncertain and do not constitute representations or warranties upon which Silver Point can rely. The parties even negotiated an express provision in the Merger Agreement to address such projections. In that provision, Silver Point expressly agreed that:

a.  "there are uncertainties inherent in attempting to make such projections";

    b.    Silver Point is "familiar with such uncertainties"; and

    c.    Silver Point "is taking full responsibility for its own evaluation of the adequacy and accuracy of all estimates, projections, forecasts, plans and budgets so furnished to it or its representatives."

(Merger Agreement § 10.12(c)). Notwithstanding this express agreement by Silver Point, Defendants are continuing to assert a claim of $2.5 million against the Escrow Fund based on their unsupportable theory.

    19.    Defendants' claim related to Sage's purported underpayment of certain state sales and use taxes is equally unsupportable and inflated for numerous reasons, including the fact that there is not a single state in the country taking the position that Sage has underpaid its sales and use taxes. The same is true with Defendants' claim related to the FCC inquiry: not only was the claim an untimely claim against the Escrow Fund under the Merger Agreement and Escrow Agreement, the claim is also improper because the FCC has not taken the position that Sage has done anything wrong or owes any money. Thus, these purported claims provide no basis for delaying payment of the Escrow Fund to Shareholders' Representative.

    20.    It has now been almost two years since Defendants acquired Sage and almost one year since the balance of the purchase price in the Escrow Fund should have been distributed to Shareholders' Representative. Defendants, however, are acting in bad faith in violation of the Merger Agreement and New York law by continuing to make improper, unsupportable, and inflated indemnity claims that are preventing the Escrow Agent from distributing the Escrow Funds to Shareholders' Representative. Shareholders' Representative has been left with no feasible choice other than petitioning this Court for relief.

    21.    All conditions precedent to this action have occurred or been waived.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

22. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 21 of this Complaint as if fully set forth herein.

23. Defendants have breached the Merger Agreement and the Escrow Agreement by engaging in the actions and omissions described herein.

24. Defendants' breaches have directly and proximately caused damages to Shareholders' Representative for which Shareholders' Representative seeks recovery from Defendants, jointly and severally.

## SECOND CAUSE OF ACTION

### (Breach of Duty of Good Faith and Fair Dealing)

25. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 24 of this Complaint as if fully set forth herein.

26. The claim notice provisions of the Escrow Agreement are governed by New York law.

27. Defendants have breached the duty of good faith and fair dealing under New York law by asserting and refusing to withdraw unsupported, inflated, and improper claim notices to prevent the distribution of the Escrow Fund to Shareholders' Representative.

28. The breaches by Defendants have directly and proximately caused damages to Shareholders' Representative for which Shareholders' Representative seeks recovery from Defendants, jointly and severally.

## THIRD CAUSE OF ACTION

### (Declaratory Judgment)

29. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 28 of this Complaint as if fully set forth herein.

30. The dispute between Shareholders' Representative and Defendants over the validity and amount of the indemnity claims asserted in Defendants' claim notices is continuing and ongoing, and it is ripe for resolution by the Court.

31. Shareholders' Representative requests that the Court resolve the dispute by declaring, according to the proofs presented at trial, the amount, if any, that each of the parties is entitled to receive from the Escrow Fund under the Merger Agreement and Escrow Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Williams, in his capacity as Shareholders' Representative, respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendants as follows:

    a.    On the First and Second Claims for Relief, in an amount according to the proof presented at trial;

    b.    On the First and Second Claims for Relief, all damages caused by Defendants' breaches of the Merger Agreement, the Escrow Agreement, and the duty of good faith and fair dealing;

    c.    On the Third Claim for Relief, declaring the amount, if any, that each of the parties is entitled to receive from the Escrow Fund under the Merger Agreement and Escrow Agreement;

    d.    Awarding Plaintiff reasonable attorneys' fees, expenses and costs; and

    e.    Such other and further relief as the Court deems appropriate.

Dated: New York, New York
March 13, 2009

LOCKE LORD BISSELL & LIDDELL LLP

By: _____
Allen C. Wasserman
885 Third Avenue, 26th Floor
New York, New York  10022
212-812-8306 Telephone
212-812-8366 Telecopier

ATTORNEYS FOR CHRISTOPHER M. WILLIAMS, in his capacity as Shareholders' Representative

OF COUNSEL:

Roger B. Cowie
(pro hac vice admission pending)
LOCKE LORD BISSELL & LIDDELL LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas  75201
214-740-8000 Telephone
214-740-8800 Telecopier

NYC 80867v.2